In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2473

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEANETTE GRIGSBY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07-cr-00342-3—**Ronald A. Guzmán**, *Judge.*

ARGUED JANUARY 10, 2012—DECIDED AUGUST 29, 2012

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Over the course of seven months, Jeanette Grigsby and several coconspirators planned and executed two bank heists, stealing more than a half-million dollars from the bank where Grigsby worked as a teller. After federal agents uncovered the inside jobs, Grigsby was indicted on two counts of entering a federally insured bank for the purpose of committing a felony. *See* 18 U.S.C. § 2113(a). She pleaded guilty

without a plea agreement to the first count and later stipulated through counsel that she committed the second crime as well. With that, the government moved to dismiss the second count.

In her sworn statement to the court, however, Grigsby minimized her role in the offense, trying to pin most of the blame on her coconspirators. So at sentencing the district court applied a two-level sentencing guidelines enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, and a three-level enhancement to account for her supervisory role in the offense, *see id.* § 3B1.1(b). The resulting guidelines range was 46 to 57 months, and the court chose a sentence of 57 months, the top of the range. Grigsby appeals, arguing that the court erroneously applied the two enhancements, and also that her sentence is procedurally defective and substantively unreasonable under 18 U.S.C. § 3553(a).

We affirm. Both enhancements were based on the court's factual finding that Grigsby lied during her plea colloquy in an intentional effort to mislead the court by understating her role in the offense. Although this finding was based largely on documentary evidence—the grand-jury testimony and plea agreements of two of Grigsby's coconspirators—our review remains deferential; we will reverse only for clear error. *See* 18 U.S.C. § 3742(e). The court's factual finding that Grigsby lied about her role in the offense because she did in fact supervise the scheme is well-supported by the evidence and specific enough to withstand clear-error review. The court also sufficiently considered the § 3553(a)

sentencing factors and was not required to specifically address Grigsby's routine arguments for a below-guide-lines sentence. Finally, Grigsby's within-guidelines sen-tence—57 months for an inside bank-robbery scheme that caused a significant loss—is not unreasonable.

## I. Background

Grigsby was a teller at a branch of Bank One (now Chase Bank) in Oak Forest, Illinois. In the summer of 2005, she and several other employees hatched a plan to steal money from the bank's vault by staging a robbery. On Grigsby's version of events, she reluctantly agreed to participate after repeated prodding from her super-visor Jennifer Barthel, who was an assistant branch man-ager. According to the other coconspirators, however, it was the other way around; they said it was Grigsby who originated and directed the scheme. Neither Grigsby nor Barthel was a novice at this sort of thing; the women had previously collaborated on a check-cashing scam not at issue in this appeal.

After the plan was conceived, Grigsby approached Tommie Gentry, a recent acquaintance, and asked him to pose as the robber. She gave Gentry the relevant details of the scheme, including a description of the bank's layout and instructions about which teller to approach. She also gave him the code phrase to alert the teller that this was the staged robbery: "Snow White." Grigsby then arranged a couple of meetings with Gentry and Barthel and instructed Gentry to find others to help carry out the robbery. She told Gentry that he and others

recruited would be paid as much as $20,000 apiece from the proceeds. Gentry got his cousin Marcus Gentry to assist.

On the morning of August 24, 2005, the day of the planned robbery, Grigsby and Tommie Gentry met at a nearby McDonald's restaurant to review the instructions. As planned, Grigsby did not participate in the theft itself and called the bank to say that she would not come to work that day. When Tommie and Marcus Gentry arrived at the bank later that morning, they approached the designated teller Miriam Girgis, who was in on the scheme, and she in turn summoned Barthel. Pretending that a robbery was underway, Barthel opened the vault and put a large amount of cash into a black bag that Marcus had carried into the bank. The Gentry cousins then fled the bank and met Grigsby at Tommie's home. Grigsby took possession of the money—totaling about $242,000—and divided it among the coconspirators.

Having been so successful on their first try, Grigsby and her accomplices initiated a second staged robbery about seven months later. Grigsby contacted Tommie Gentry to set things in motion. Gentry, in turn, recruited two new coconspirators. On March 22, 2006, the day of the second robbery, Grigsby sent Gentry a text message giving him an "all clear" to proceed with the plan. Gentry directed the new recruits to enter the bank. As before, Barthel gave them access to the vault, and they absconded with about $272,500. Grigsby again distributed the money. This time, however, federal agents unraveled the scheme and arrested the culprits.

A grand jury indicted Grigsby on two counts of entering a bank with intent to commit a felony in violation of 18 U.S.C. § 2113(a). The coconspirators were indicted as well, and all pleaded guilty pursuant to plea agreements. Grigsby eventually announced her intention to plead guilty to the count pertaining to the first staged robbery. She did not have a plea agreement, however, so the district court asked Grigsby and the government to discuss the factual basis for her plea so that they might avoid disputes. After meeting with prosecutors, Grigsby offered the following statement to the court under oath:

> On August 24th, 2005, I assisted Jenna Barthel, which is my supervisor at the time at Bank One, to stage a bank robbery in which she came to me and asked me that if I knew of anyone that will assist her, she will order the money, she will load the bag up, she will do all of that. I once told her no. Then she asked me again; and then I told her, yeah, but I didn't want to have any parts to do with that; I don't want to be anywhere around. She says, you black; you know that you can get someone to do that; that's what you all do. So I gathered to do such, introduced her to Thomas Gentry. Then he and her proceeded to carry out the act. And doing so, when the—the staged armed robbery had taken place, later on I received monies from that staged bank robbery.

The prosecutor asked a few follow-up questions about whether the bank was federally insured and how much money Grigsby received from the scheme. The district

court accepted this as a factual basis for Grigsby's guilty plea. The government moved to dismiss the second count after Grigsby stipulated, through her counsel, that she committed the second offense as well.

Grigsby's presentence report recommended a two-level guidelines enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, based on her sworn statement to the court at her guilty-plea hearing in which she substantially understated her role in the offense. The presentence report also recommended a three-level enhancement under U.S.S.G. § 3B1.1(b) for Grigsby's supervisory role in the scheme. At sentencing the prosecutor submitted Barthel's and Tommie Gentry's grand-jury testimony and written plea agreements to prove that Grigsby in fact supervised the scheme and lied about her role during her plea colloquy. Notwithstanding its position on the obstruction-of-justice enhancement, the government did not object to a three-level reduction for acceptance of responsibility, *see id.* § 3E1.1(b), based on Grigsby's timely guilty plea and her stipulation to the second robbery.

The district court adopted these recommendations. Regarding the two-level enhancement for obstruction of justice, the judge found as follows:

> I agree with the government. There was an obstruction of justice here. There was a clear material—let me make it clear—a clear material misrepresentation as to what her role in the offense was. She turned it upside down. Everything she said was contradicted by the others with respect to what her role was, and that was for the purpose of escaping culpability.

Regarding Grigsby's role in the offense, the judge elabo-rated as follows:

> I think there are several witnesses or multiple wit-nesses who make this defendant clearly a recruiter and a decision-maker and an organizer. First, her coworkers say she recruited them, not the other way around. Tomm[ie] Gentry says clearly she recruited him. No one else recruited him. No one else reached out to him. She did. And recruiting co-conspirators is one of the things one looks at in determining whether an adjustment for role in the offense is ap-propriate.

> Second, she met at every important stage with the participants to plan this robbery or theft. She met with Barthel and Tomm[ie] Gentry. She met with Tomm[ie] Gentry and Marcus Gentry. She arranged for who was going to be present and who was not going to be present at the time of the offense. Very important. Very important. She controlled the pro-ceeds of the theft. She went to the house and got from Tomm[ie] Gentry the proceeds of this offense and then she parce[led] out the proceeds to Barthel and [codefendant Miriam] Girgis. That's organiza-tion, decision-making and recruiting. She merits a three point increase in adjustment for role in the offense.

The resulting guidelines range was 46 to 57 months. Grigsby's attorney argued for a below-guidelines sen-tence, relying mostly on Grigsby's history of overcoming childhood abuse, her status as a first-time offender, and

her relationship with her children. The judge did not specifically address these arguments, focusing instead on "the magnitude of this offense [and] the defendant's participation in it." The judge noted that Grigsby's conduct involved "repeated decisions over substantial periods of time," and reflected a deliberate and sustained choice "to do wrong for no other reason than personal gain." The judge also found it "difficult to comprehend the determination on this defendant's part to gut her employer in a false, deceptive and malicious manner on several fronts." Finally, the judge noted "the need for rehabilitation and the necessity to impose some modicum of restraint on future conduct." The court imposed a sentence of 57 months, at the top of the range.

## II. Discussion

Grigsby challenges her sentence on several grounds. She argues that the district court erroneously applied the two-level enhancement for obstruction of justice and the three-level enhancement for supervising others in the scheme. *See* U.S.S.G. §§ 3C1.1, 3B1.1(b). She also contends that her 57-month sentence is procedurally defective and substantively unreasonable because the district court failed to meaningfully consider the § 3553(a) factors.

### A. Obstruction-of-Justice Enhancement

The sentencing guidelines provide for a two-level increase in offense level if the defendant "willfully ob-

structed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." *Id.* § 3C1.1. Among other things, this enhancement applies if the defendant commits perjury during judicial proceedings. *See United States v. Dunnigan*, 507 U.S. 87, 93-94 (1993); *United States v. Anderson*, 580 F.3d 639, 648 (7th Cir. 2009).

Grigsby wages a broad-spectrum attack on the district court's application of the obstruction enhancement. First, she argues that the government waived its opportunity to ask for the enhancement by failing to immediately object to her perjured testimony during the plea hearing. Second, she maintains that the statements she made about her role in the offense were not material to the purpose of the plea colloquy—namely, to establish a factual basis for her guilty plea—and therefore cannot be the basis of an obstruction-of-justice enhancement. Third, she asserts that the judge was required to specifically identify which part of her statement was false, and his failure to do so is reversible error. Finally, she argues that the evidence is insufficient to support the court's finding that her statement was false and intentionally misleading.

Grigsby's waiver argument is obviously flawed. It is true that the government waives sentencing arguments not made in a timely fashion, *see United States v. Sutton*, 582 F.3d 781, 786 (7th Cir. 2009), but here, the government raised the obstruction-of-justice issue at sentencing, which is the proper time to pursue guidelines

enhancements. The government was not required to object to Grigsby's perjured testimony during the plea hearing in order to preserve the issue for sentencing.

Grigsby's argument about materiality is likewise obviously mistaken. A defendant commits perjury "if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. A false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010) (quotation marks omitted). The statement need not *actually* affect the decision. *Id.* Grigsby argues that the purpose of a plea colloquy is to establish a factual basis for a defendant's guilty plea—not to determine whether a particular sentencing enhancement should apply—and therefore any false statement about her role in the offense was not material to the purpose of her plea hearing.

This conception of materiality is far too narrow. A guilty-plea proceeding is not limited to establishing the factual basis for the plea; it also lays some of the groundwork for the sentence. The defendant's testimony during a plea colloquy—like the defendant's testimony during a pretrial suppression hearing or at trial—is highly relevant at sentencing. The obstruction-of-justice enhancement seeks to maintain the integrity of the entire adjudicative process. *See* U.S.S.G. § 3C1.1 (enhancement applies to obstruction "with respect to the *investigation,*

*prosecution, or sentencing* of the instant offense of con-viction" (emphasis added)); *id.* § 3C1.1 cmt. n.1 ("This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the *investigation, prosecution, or sentencing* of the defendant's instant offense of conviction, and (B) related to . . . the de-fendant's offense of conviction *and any relevant conduct* . . . ." (emphases added)). A defendant's deliberate attempt to mislead the court implicates the basic purpose of the obstruction enhancement, whether it occurs during a plea hearing, at trial, or at some other point in the criminal process. This understanding of the enhancement is implicit in our prior decisions. *See United States v. Johnson*, 612 F.3d 889, 895 (7th Cir. 2010); *United States v. Parker*, 25 F.3d 442, 449 n.4 (7th Cir. 1994). We now make the point explicit: A de-fendant's statements during a plea colloquy are material if they have a natural tendency to influence the court's sentencing decision.

Here, the materiality of Grigsby's false statements is quite obvious. The issue of her role in the offense was sure to come up during sentencing and would determine whether she qualified for an "organizer or leader" enhancement under § 3B1.1(a), or a "manager or supervisor" enhancement under § 3B1.1(b). Her lie didn't fool anyone, but that doesn't make it immaterial. *See United States v. DeLeon*, 603 F.3d 397, 404 (7th Cir. 2010) ("[A]ll that is required for obstruction of justice is that the act could affect, to some reasonable proba-bility, the outcome of the judicial process; the [act] does not have to succeed in affecting the outcome." (quotation marks omitted)).

Grigsby also maintains that the district court failed to identify which part of her statement was false. The court instead made a general finding that "[e]verything she said was contradicted by the others with respect to what her role was." Grigsby insists that this finding was not particularized enough to support the obstruction-of-justice enhancement.

This argument misunderstands the governing legal principle, which does not require the judge "to conduct a mini-trial with respect to each of the defendant's false statements" or "set forth his or her findings specifically in terms of the elements of perjury." *United States v. White*, 240 F.3d 656, 662 (7th Cir. 2001). Nor must the judge identify with particularity the specific statements that were false. As the Supreme Court has explained,

> if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. . . . When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if . . . the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.

*Dunnigan*, 507 U.S. at 95. Thus, we have held that "separate findings are not strictly necessary so long as the court determined that the defendant lied to the judge" about material matters. *White*, 240 F.3d at 662.

Here, the judge explained that Grigsby's sworn testimony during her plea hearing constituted "a clear material misrepresentation as to what her role in this offense was." The judge said that "[s]he turned it upside down," that her testimony "was contradicted by the others with respect to what her role was," and that her misrepresentation was made "for the purpose of escaping culpability." These findings easily surpass the level of specificity required by *Dunnigan*. More than once, the district court made it clear that Grigsby misrepresented her role in the offense.

Indeed, this was the part of her plea colloquy that the presentence report and the prosecutor had identified as false. In her change-of-plea hearing, Grigsby testified that Barthel "came to me" asking for assistance and that "I once told her no." Grigsby then claimed that Barthel "asked me again; and then I told her, yeah, but I didn't want to have any parts to do with that; I don't want to be anywhere around." Grigsby also claimed that Barthel asked her to find someone to carry out the staged robbery and that Grigsby then "introduced her to Thomas Gentry." These statements were plainly aimed at minimizing Grigsby's role and deflecting most of the blame for the scheme onto Barthel. When the judge found that Grigsby had lied about her role, he was obviously referring to these statements.

Grigsby specifically criticizes the judge for lumping together "[e]verything she said." This argument takes the judge's reference to "everything" out of context. The actual finding was that "[e]verything she said was contradicted by others *with respect to what her role was*." (Emphasis added.) In context, the statement is easily understood; the judge believed Barthel's and Gentry's version of events and thought that Grigsby had deliberately understated her own role in planning and executing the scheme. The court's findings were sufficiently particularized to satisfy *Dunnigan*.

Finally, Grigsby argues that the evidence was insufficient to support the court's finding that her testimony was both false and intentionally misleading. Sentencing findings are reviewed for clear error. *United States v. Pellmann*, 668 F.3d 918, 926 (7th Cir. 2012). In this case, the district court based its findings largely on documentary evidence—specifically the grand-jury testimony and plea agreements of coconspirators Barthel and Gentry—rather than their live testimony. Grigsby seems to suggest that clear-error review applies with less force when the court's decision is based on documentary evidence. Not so.

In the sentencing context, clear-error review is required by statute:

> The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and . . . shall give due deference

to the district court's application of the guidelines to the facts.

18 U.S.C. § 3742(e). There is no exception for factual findings based on documentary evidence. By way of analogy, prior to 1985, Rule 52(a) of the Federal Rules of Civil Procedure stated generally that clear-error review applied to factual findings, but some circuits nonetheless reviewed factual findings based on documentary evidence under a lesser standard. The Supreme Court rejected that approach in *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574 (1985), holding that clear-error review applies "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts."

The Court began by pointing out that Rule 52(a) "'does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous.'" *Id.* (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982)). The Court explained:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact deter-

mination at a huge cost in diversion of judicial re-
sources. In addition, the parties to a case on appeal
have already been forced to concentrate their
energies and resources on persuading the trial
judge that their account of the facts is the correct
one; requiring them to persuade three more judges
at the appellate level is requiring too much. As the
Court has stated in a different context, the trial on
the merits should be "the 'main event' . . . rather
than a 'tryout on the road.' " *Wainwright v. Sykes*, 433
U.S. 72, 90 (1977). For these reasons, review of
factual findings under the clearly-erroneous stan-
dard—with its deference to the trier of fact—is the
rule, not the exception.

*Id.* at 574-75. That same year, the Rules Committee
amended Rule 52(a) to clarify that clear-error review
applies to all findings of fact, "whether based on oral
*or documentary* evidence."[1] FED. R. CIV. P. 52(a) (1985)
(emphasis added).

The Court's reasoning in *Anderson* straightforwardly
applies to § 3742(e). Like Rule 52(a), § 3742(e) " 'does not
make exceptions or purport to exclude certain categories
of factual findings from the obligation of a court of
appeals to accept a district court's findings unless clearly

---

[1] Rule 52(a) now provides that "[f]indings of fact, whether
based on oral or other evidence, must not be set aside unless
clearly erroneous." The language change was stylistic and not
meant to affect the meaning of the rule. *See* FED. R. CIV. P. 52
advisory committee's note on 2007 amends.

erroneous.'" *Anderson*, 470 U.S. at 574 (quoting *Pull-man-Standard*, 456 U.S. at 287). Also, "the considerations underlying [clear-error review]—the demands of judicial efficiency, the expertise developed by trial judges, and the importance of first hand observation, *see* [*id.*] at 574-75—all apply with full force in the criminal context." *Maine v. Taylor*, 477 U.S. 131, 145 (1986); *see also Hernandez v. New York*, 500 U.S. 352, 365-66 (1991) (plurality opinion) ("While no comparable rule [to Rule 52(a)] exists for federal criminal cases, we have held that the same standard should apply to review of findings in criminal cases on issues other than guilt.").

This is especially true at sentencing. In applying the sentencing guidelines, the court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Thus, we have applied clear-error review under § 3742(e) to factual findings based on documentary evidence, *see, e.g., United States v. Beal*, 960 F.2d 629, 632-34 (7th Cir. 1992) (credibility finding based on presentence report), and other circuits have done the same outside the sentencing context, *see, e.g., United States v. Stevenson*, 396 F.3d 538, 543 (4th Cir. 2005) (holding that clear-error review applies in criminal cases "even when findings of fact are not based on observations of credibility, but rather on undisputed evidence or on entirely documentary evidence"); *Guerrero v. United States*, 383 F.3d 409, 414-16 (6th Cir. 2004) (reaffirming an earlier holding

that clear-error review applies to factual findings even when based on documentary evidence).[2]

More generally, then, when reviewing factual findings for clear error, we will affirm "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 573-74, and reverse only if we are "left with the definite and

---

[2] Section 3742(e) specifically requires that the reviewing court give "due regard" to the district court's credibility determinations, a deferential standard based on the district court's superior position to make these kinds of judgments. When the district court has the benefit of hearing live testimony, we generally accept the court's credibility assessment unless "it was 'physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Speed*, 656 F.3d 714, 718 (7th Cir. 2011) (quoting *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006)). This is because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 575 (1985).

However, this highly deferential approach to credibility assessments based on live testimony does not imply that a weakened form of clear-error review applies to *other* credibility determinations. Rather, it means only that if a district court's credibility determination turns in part on documentary evidence, then a finding of clear error might be based on something short of physical impossibility. *See United States v. Ataya*, 864 F.2d 1324, 1337 (7th Cir. 1988) (recognizing that clear-error review of documentary evidence "is somewhat less rigid" than review of live testimony).

firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395. No such error occurred here. Grigsby told the court that she was first approached by Barthel about assisting her in stealing from the bank's vault, that she initially declined to participate, and that she later reluctantly agreed to help recruit Gentry. She also specifically said she "didn't want to have any parts to do" with the crime itself and didn't "want to be anywhere around."

In contrast, Barthel directly contradicted Grigsby's version of events; she consistently maintained that Grigsby occupied a leading role in the scheme. According to Barthel, it was *Grigsby* who first approached *her*—not the other way around. Grigsby told her that "the people that she had recruited were serious and dangerous" and that she needed Barthel "to cooperate to ensure that the robbery went smoothly and no one got hurt." Barthel also confirmed that after the staged robberies, Grigsby took possession of the cash and distributed the proceeds.

Gentry, too, contradicted substantial parts of Grigsby's testimony. He said that Grigsby approached him several times about participating in the scheme and asked him to recruit others to help stage the robbery. He also detailed how Grigsby took a supervisory role in planning and directing the crime. Gentry testified that he, Grigsby, and Barthel met at least twice before the robbery to discuss the details, and that he and Grigsby met on the morning of the first robbery to review the plans one last time. He also testified that Grigsby met with him after

the robbery so that she could take control of the money and distribute it to the coconspirators. Finally, Gentry explained that Grigsby contacted him again about staging a second robbery and asked for his help. On the morning of the robbery, Grigsby sent Gentry a text message giving him the "all clear" to proceed with the heist.

Although Barthel and Gentry acknowledged that they had previously lied to the FBI, the district court did not clearly err in crediting their version of events over Grigsby's. Their description of Grigsby's role flatly contradicted Grigsby's sworn statement to the court. The two versions were irreconcilable, so the court credited Barthel's and Gentry's, and found that Grigsby's statement was actually false, not merely misleading. *Cf. Bronston v. United States*, 409 U.S. 352, 360 (1973) (misleading but literally truthful statements do not constitute perjury). Other statements, while perhaps not perjurious, were plainly misleading and provided the court with ample reason to think that Grigsby was deliberately trying to minimize her role in the offense. For instance, Grigsby said that after she reluctantly agreed to help recruit Gentry, she clarified that she "didn't want to have any parts to do" with the scheme and didn't "want to be anywhere around." This was highly misleading; both Barthel and Gentry said that Grigsby supervised the execution of the scheme. Her absence from the bank was part of an effort to conceal her role—not, as she suggested in her plea colloquy, an effort to distance herself from participating in the crime.

In weighing this contradictory testimony, the district court was well positioned to choose which version to

believe. Most significantly, the judge heard Grigsby's live testimony during her plea colloquy; by that time, he had also conducted plea colloquies with almost all of Grigsby's codefendants.[3] To be sure, none of these witnesses testified at Grigsby's sentencing hearing; the court seems to have relied heavily on the grand-jury transcripts.[4] As we have explained, however, the court's reliance on documentary evidence does not affect the standard of review. The record is easily sufficient to support the district court's finding that Grigsby intentionally lied to the court in an effort to downplay her culpability. The court properly applied the obstruction-of-justice enhancement.

## B. Supervisory-Role Enhancement

A defendant who is "an organizer or leader" of a criminal scheme involving five or more participants gets

---

[3] The change-of-plea hearings took place on December 2, 2009 (Marcus Gentry); December 16, 2009 (Tommie Gentry, Jr.); February 19, 2010 (Jennifer Barthel); July 8, 2010 (Dirk Green); and December 23, 2010 (Miriam Girgis). Grigsby's change-of-plea hearing took place on July 13, 2010. Also, by the time of Grigsby's sentencing hearing on June 1, 2011, the court had sentenced three of the codefendants (Green, Girgis, and Marcus Gentry).

[4] Grigsby did not request an evidentiary hearing, nor did she contend that such a hearing was necessary before the court decided whose account to credit regarding her role in the offense.

a four-level enhancement under U.S.S.G. § 3B1.1(a); "a manager or supervisor" of a scheme involving five or more participants gets a three-level enhancement under § 3B1.1(b); and "an organizer, leader, manager, or supervisor" of a smaller scheme gets a two-level enhancement under § 3B1.1(c). The district court classified Grigsby as a supervisor and applied the three-level enhancement under § 3B1.1(b).

The application notes to § 3B1.1 explain that

> [i]n distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1 cmt. n.4. These factors are sometimes applied to determine whether a defendant was a manager or supervisor for purposes of § 3B1.1(b), but we have recently clarified that these factors are meant to *distinguish* a leader or organizer from a supervisor or

manager. *See United States v. Figueroa*, 682 F.3d 694, 694-95 (7th Cir. 2012). In other words, these factors may be of little use in "determining whether a participant who is neither a boss nor a grunt is a manager or (the same thing, just a different word) a supervisor." *Id.* at 696. Thus, we held in *Figueroa* that a manager or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme. *Id.* at 697-98.

We have already explained that clear-error review applies and that the district court did not clearly err when it credited the coconspirators' testimony over Grigsby's. It follows, then, that the district court properly applied the supervisory-role enhancement. According to Barthel and Gentry, Grigsby initiated the scheme, played a leading role in recruiting the coconspirators, and supervised the execution of the staged robberies from outside the bank. She then took custody of the proceeds and divided the money among the coconspirators. On these facts Grigsby may well have qualified for the "organizer or leader" enhancement, but the district court surely had a sufficient factual basis to apply the lesser "manager or supervisor" enhancement.

Grigsby continues to insist that Barthel organized the conspiracy, but this argument gets nowhere in light of the district court's decision to credit her coconspirators' version of events. Even if we were to accept that Grigsby and Barthel were *equally* culpable, Grigsby would deserve at least the supervisory-role enhancement. The

committee notes to § 3B1.1 make it clear that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4. The same is obviously true of the "manager or supervisor" designation. Grigsby's participation in planning the scheme, recruiting the participants, and directing its execution all confirm her role as a supervisor.

## C. Section 3553(a)

Grigsby argues that the district court failed to properly consider the § 3553(a) sentencing factors and imposed an unreasonable sentence. The district court's procedural compliance with § 3553(a) is subject to de novo review. *United States v. Cantrell*, 617 F.3d 919, 922 (7th Cir. 2010). We review the reasonableness of the sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

The sentencing court must adequately "explain why the sentence imposed is appropriate in light of the statutory factors specified in § 3553(a)." *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006). However, we have said many times that this obligation does not require "comprehensively discuss[ing] each of the factors." *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009). Because defendants often raise "stock arguments that sentencing courts see routinely," we have held that "a sentencing court is certainly free to reject [those arguments] without discussion." *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008). Accordingly,

"we regularly affirm sentences where the district judge does not explicitly mention each mitigation argument raised by the defendant." *United States v. Paige*, 611 F.3d 397, 398 (7th Cir. 2010). Procedural compliance with § 3553(a) thus requires that the judge give "meaningful consideration" to the relevant factors in light of the individual circumstances of the case, *id.*, but not that he "step through each § 3553(a) factor in checklist fashion," *United States v. Reyes-Medina*, 683 F.3d 837, 840 (7th Cir. 2012).

Grigsby first argues that the district court failed to meaningfully consider her "history and characteristics," § 3553(a)(1), because the court did not specifically address certain aspects of her personal history—in particular, that she overcame childhood abuse, was a first-time offender, and had a strong relationship with her children. These are among the stock arguments that sentencing judges routinely hear and may choose to acknowledge only generally. This is particularly so where, as here, the arguments have little to do with the defendant's culpability. Before pronouncing sentence, the judge stated in general terms that he had "reviewed the presentence investigation report, the supplemental reports, . . . the submissions on behalf of the defendant, . . . and of course I take into account the arguments and representations made by the attorneys, as well as the statement made by the defendant." Under the circumstances here, this is all that § 3553(a) requires.

Grigsby next argues that the court failed to consider "the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In particular, she complains that she was treated more harshly than her codefendants. She notes that Barthel was sentenced to serve 18 months, and Miriam Girgis, the other teller who was in on the scheme, got only 15 months. As we have repeatedly explained, however, § 3553(a)(6) addresses unwarranted disparities "not among codefendants or coconspirators but among judges or districts." *United States v. Scott*, 631 F.3d 401, 405 (7th Cir. 2011); *see also United States v. Sandoval*, 668 F.3d 865, 873 (7th Cir. 2011) (describing "our refusal to entertain sentencing challenges based on disparities between codefendants' sentences"). And because the sentencing guidelines are based on national sentencing patterns, *see Rita v. United States*, 551 U.S. 338, 349 (2007), we have also held that a district court necessarily considers the interest in consistency between similarly situated defendants when it considers a properly calcu-lated guidelines recommendation, *see United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). The district court's discretion in evaluating the § 3553(a) factors *allows* but does not *require* the court to consider disparities within a particular case. *Id*.; *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009).[5]

---

[5] This view is consistent with precedent in other circuits. *See, e.g., United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir.

(continued...)

In any event, the difference between Grigsby's sentence and those of her codefendants can hardly be characterized as "unwarranted." "[A] sentencing *difference* is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation," *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006), and obvious reasons account for the divergent sentences in this case. It should be clear by now that Grigsby's supervisory role in the offense and her perjury during her plea colloquy put her in a very different position than her coconspirators, who cooperated with the government and did not commit perjury. *See id.* ("[A] sentencing difference based on one culprit's assistance to the prosecution is legally appropriate.").

Finally, Grigsby contends that her sentence is substantively unreasonable. Because Grigsby's sentence falls within a properly calculated guidelines range, it is entitled to a presumption of reasonableness, and she has the burden of overcoming this presumption. *United States v. Vizcarra*, 668 F.3d 516, 527 (7th Cir. 2012). She has not done so. The judge explained that the 57-month sentence—at the upper end of the guidelines range—was warranted based on the seriousness of the crime and Grigsby's role in it, and in particular, her repeated viola-

---

[5] (...continued)
2010) ("[A]lthough § 3553(a) does not require a consideration of co-defendant disparity, it is not improper for a district court to undertake such a comparison." (internal citation omitted)); *see also United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007) (collecting cases).

tion of the trust placed in her by the bank. Grigsby simply reiterates her argument that the district court unjustifiably treated her more harshly than her co-defendants. This is insufficient to rebut the presumption.

AFFIRMED.