NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 30, 2012
Decided January 25, 2013

**Before**

WILLIAM J. BAUER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 12-2105

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:10-cr-00027-2 |
| MICHAEL SAMOJLA, *Defendant-Appellant.* | John F. Grady, *Judge.* |

**O R D E R**

Michael Samojla was part of a scheme to defraud Coldwell Banker that involved submitting invoices and receiving payments for work that had never been performed. He pleaded guilty to wire fraud, 18 U.S.C. § 1343, and the district court sentenced him to 84 months' imprisonment. On appeal, Samojla challenges the district court's application of two sentencing enhancements to his base offense level under U.S.S.G. §§ 3B1.1(a) and 3C1.1. Finding no error, we affirm.

In 1999, Samojla worked at his parents' medical inventory business. That year, he and his friend Douglas Volkman came up with a plan to defraud Volkman's employer, Coldwell Banker. Volkman worked as a financial manager at Coldwell Banker's office in Des Plaines, Illinois. As a financial manager, Volkman reviewed invoices submitted to Coldwell Banker by third-party vendor companies that provided goods or services to Coldwell Banker, and approved them for payment. Samojla and Volkman devised a scheme to create sham vendor companies—the companies would not actually perform any services or provide any goods—that would submit fraudulent invoices to Coldwell Banker, and Volkman would use his position to approve those invoices. Samojla and Volkman agreed that Volkman would recruit others to create the sham businesses.

Around that time, Samojla approached an employee of his parents' company, Beverly Zeitz, who had complained to Samojla about her financial problems. Samojla explained the scheme to Zeitz and asked if she wanted to join. Zeitz accepted, and Samojla told her to create a fictitious marketing company and provide him with the name and taxpayer identification number for the company. Samojla explained that he would provide that information to his friend who worked at Coldwell Banker. Samojla told Zeitz that when she received a check from Coldwell Banker, she was to cash the check, keep 25% for herself, and return the rest in two envelopes (50% of the total in one for Volkman, and the remaining 25% in the other for Samojla).

Zeitz and her husband formed "Z Designs" and provided the information to Samojla, who passed it on to Volkman. Volkman then began creating phony invoices for "Z Designs" and approving them for payments. Samojla usually delivered the checks to Zeitz or her husband, who cashed the checks, took the Zeitz's share, and returned the remaining money to Samojla in two envelopes. Sometimes Volkman would deliver the checks and receive the proceeds from Zeitz.

Volkman created false invoices for "Z Designs" from September 1999 through June 2004; Coldwell Banker checks totaling $883,264 were issued to "Z Designs."

In 2000, Zeitz asked Samojla if her sister could join the scheme; Samojla agreed. Zeitz's sister and her sister's husband created "A&B Graphics," and Volkman began creating and approving sham invoices for "A&B Graphics." The money was apportioned as Samojla had previously instructed Zeitz: Zeitz's sister received 25% of the funds, and the remainder was returned to Samojla, who received 25%, and Volkman, who received 50%. Zeitz usually delivered the checks to her sister and returned the remaining funds to Samojla. False invoices were created for "A&B Graphics" from January 2000 to December 2002, and "A&B Graphics" received checks totaling $597,320.

In 2003, Samojla recruited Anthony Palermo to join the scheme. Together, Samojla and Palermo created two additional sham companies, "AJP Enterprises, Inc." and "MSAP Services, Inc." Samojla relayed the companies' information to Volkman, who created and approved fraudulent invoices for the companies. Samojla or Palermo picked up the checks and deposited them in the sham companies' respective bank accounts. The proceeds, which were received by way of payroll checks from the companies, were divided in the same way as in the past: Volkman received 50%, Samojla received 25%, and Palermo received 25%.

Volkman created and approved false invoices for "AJP Enterprises" from January 2003 to December 2006; payments to "AJP Enterprises" totaled $1,709,871. "MSAP Services" received a total of $2,805,726 for fraudulent invoices created between January 2003 and November 2007.

In December 2007, Samojla learned that Volkman had been arrested for stabbing the CFO of Coldwell Banker, which, unsurprisingly, brought the scheme to an end. By this point, the total amount of fraud against Coldwell Banker was $5,996,181; Volkman had received about $2,998,090.50; Samojla had received about $1,499,0425.25; and Palermo had received about $1,128,899.25.

In May 2008, Samojla and Palermo received a grand jury subpoena requesting corporate records for "AJP Enterprises" and "MSAP Services," including articles of incorporation and meeting minutes. As there were no actual meeting minutes for "AJP Enterprises" and "MSAP Services," Palermo bought a book on writing corporate minutes and drafted fake "minutes." Samojla reviewed the fake minutes and produced them to the Federal Bureau of Investigation.

On January 12, 2010, a grand jury returned an indictment charging Samojla and others involved in the scheme with wire fraud. Samojla pleaded guilty to one count of wire fraud, 18 U.S.C. § 1343, on October 19, 2011. The presentence investigation report ("PSR") recommended a total offense level of 28 points, resulting in part from two enhancements objected to by Samojla: a four-level enhancement for Samojla's role in the offense as a "leader or organizer" under U.S.S.G. § 3B1.1(a), and a two-level enhancement under U.S.S.G. § 3C1.1 for obstructing justice by submitting the fabricated corporate minutes to the FBI. The district court overruled Samojla's objections and sentenced him to 84 months' imprisonment and three years of supervised release. Samojla timely appealed, and he now challenges the district court's application of U.S.S.G. §§ 3B1.1(a) and 3C1.1 to his sentence.

We review *de novo* the interpretation and application of the Sentencing Guidelines, and factual findings for clear error. *United States v. Rollins*, 544 F.3d 820, 837 (7th Cir. 2008) (citations omitted). Whether a defendant exercised a leadership or managerial role in the charged offense is a determination that we review for clear error. *United States v. Johnson*, 489

F.3d 794, 796 (7th Cir. 2007). We also review a district court's factual findings in support of an obstruction of justice enhancement under the clearly erroneous standard. *United States v. Strode*, 552 F.3d 630, 635 (7th Cir. 2009). "We will disturb the district court's findings as clearly erroneous only if our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. Selvie*, 684 F.3d 679, 682 (7th Cir. 2012) (internal quotation marks and citations omitted).

Section 3B1.1 of the United States Sentencing Guidelines provides for an increase in the base offense level of a defendant who is found to be an organizer, leader, manager, or supervisor of criminal activity. The purpose of this enhancement is "to penalize more heavily those defendants who bear greater responsibility for crimes involving many individuals, both to reflect their greater degree of culpability and in recognition that such individuals are likely to profit more from the crime and pose a greater danger to the community and risk of recidivism." *United States v. Wasz*, 450 F.3d 720, 729 (7th Cir. 2006).

Section 3B1.1(a), the specific enhancement applied here, calls for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" Samojla does not dispute that the scheme involved more than five participants, so we focus on Samojla's role within it. Application Note 4 to § 3B1.1 directs courts making this determination to consider factors including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt., n.4.

The district court considered and weighed each of these factors and concluded that the four-level enhancement was warranted, and we find that Samojla's role in the offense was sufficient to allow the district court to apply the enhancement without committing clear error. Regarding the nature of Samojla's participation in the commission of the fraud, the district court found that "he was in it up to his neck": Samojla admitted in his plea agreement that he jointly "devised" and "developed" the scheme with Volkman and carried it out from beginning to end. Although Samojla argues that Volkman was the "one" leader of the scheme, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.* § 3B1.1, cmt., n.4; *United States v. Millet*, 510 F.3d 668, 679 n.1 (7th Cir. 2007). And it was Samojla—not Volkman—who personally recruited Zeitz and Palermo, explained the mechanics of the fraud to them, instructed them to create the sham businesses, told them how to divide up the funds they received, and frequently dropped off the checks and picked up his and Volkman's share of the proceeds. He, like Volkman, received a cut of every

transaction in the scheme and he ended up with a larger share of the fruits of the crime than all other participants except Volkman.

Samojla's arguments against the enhancement largely focus on the first and last factors. He contends that the district court erred in applying the enhancement because the district court found that "Samojla had neither control nor decision making authority." This argument fails for several reasons. First, this is not an accurate description of the district court's findings. Rather, in discussing the factors set forth in Note 4 to § 3B1.1, the district court concluded that the evidence regarding Samojla's decision making authority was "very weak" and that the evidence regarding Samojla's control and authority over the other participants recruits was "minimal." We acknowledge that this is a subtle distinction, but one worth noting.[1] Additionally, the district court's discussion of these factors indicating the weakness of the evidence indicative of Samojla's decision-making authority and control was due to the nature of the offense, which was "fairly simple fraud," and to its smooth operation, not to Samojla's relative role in the offense. Neither Samojla nor Volkman had to repeatedly instruct or discipline the other participants because there was no need to: once Samojla and Volkman set up the scheme, everyone received his or her share of the proceeds and it operated without incident until Volkman stabbed the CFO of Coldwell Banker.

Finally, Samojla's arguments regarding the decision-making authority and control factors fail to convince us that the district court clearly erred because a relatively weak showing in two of the factors is not fatal to the application of U.S.S.G. § 3B1.1. We have said that no single factor "is essential in determining whether the adjustment applies, and a court need not assign equal weight to each factor." *United States v. Robertson*, 662 F.3d 871, 877 (7th Cir. 2011) (citations omitted); *see also United States v. Mustread*, 42 F.3d 1097, 1104 n.3 (7th Cir. 1994) (noting that "slavish adherence" to the factors is unnecessary). Given that the other factors listed in Application Note 4 that the district court considered strongly supported application of the enhancement, we find no clear error in the district court's weighing of the factors and ultimate finding that Samojla was a leader or organizer under U.S.S.G. § 3B1.1.

Samojla's other arguments regarding the remaining factors ignore or downplay his key role in devising and organizing the scheme and its participants and focus instead on the scope of

---

[1] We recently acknowledged that two lines of authority exist in our circuit regarding "whether or not a defendant must have exerted 'control' over other participants for the enhancement to apply." *United States v. Robertson*, 662 F.3d 871, 877 (7th Cir. 2011) (comparing cases). But we need not resolve that tension here as the district court found that Samojla exercised some—even if "minimal"—control over his recruits.

his main duties—delivering checks and collecting proceeds—after the initial set-up of the scheme. But "[a] leader need not occupy a permanent hierarchical relationship with others in the organization. He may organize others for only portions of the conspiracy." *United States v. Salinas*, 62 F.3d 855, 862 (7th Cir. 1995). As we have said, Samojla and Volkman devised and organized the scheme together, and Samojla's more limited role in the scheme after its initial set-up resulted from its simple nature and problem-free operation, not from his relative role in the scheme.

Samojla's arguments regarding the application of the obstruction enhancement under U.S.S.G. § 3C1.1 for submitting the false corporate minutes to the FBI are similarly unavailing. Section 3C1.1 calls for a two-level enhancement in a defendant's base offense level when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and the obstructive conduct "related to the defendant's offense of conviction and any relevant conduct[.]" The purpose of the obstruction enhancement is "to maintain the integrity of the entire adjudicative process." *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012) (citations omitted). The section's application notes list several types of conduct that qualify as obstructive and to which the enhancement is intended to apply. U.S.S.G. § 3C1.1, cmt., n.3 & 4. Specifically, as relevant here, the notes make clear that "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" is "conduct to which [the obstruction] adjustment applies[.]" *Id.* § 3C1.1, cmt., n.4(C).

Samojla contends that the evidence did not support a finding of willfulness in this case. Section 3C1.1 requires "willful" obstruction of justice, and we have interpreted this to mean with a specific intent to obstruct justice. *United States v. Martinez*, 650 F.3d 667, 670 (7th Cir. 2011) (citations omitted); *United States v. Schwanke*, 694 F.3d 894, 896 (7th Cir. 2012) (per curiam) (citations omitted). We have said that "because of limitations on mind reading, willfulness usually has to be inferred from conduct rather than being determined directly." *United States v. Gonzalez*, 608 F.3d 1001, 1007 (7th Cir. 2010) (citing *Ratzlaf v. United States*, 510 U.S. 135, 149 n.19, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]illfulness 'is usually established by drawing reasonable inferences from the available facts[.]'")).

Here, the district court's findings regarding Samojla's conduct in producing the minutes are clearly sufficient to support a finding of willfulness and the application of the obstruction enhancement. The district court found that the minutes that Samojla submitted to the FBI were "clearly fraudulent," created "for the purpose of misleading the FBI in its investigation," and were "intended to create the false impression that ['MSAP' and 'AJP'] were legitimate businesses . . . engaged in legitimate business operations whereas the fact was they were sham

corporations that were created for no purpose other than to defraud Coldwell Banker and had no activity except the perpetration of that fraud." Samojla does not challenge these findings, but argues that the minutes do not directly contradict the charges against him, and therefore cannot be found to be willfully obstructive. There is no such requirement under U.S.S.G. § 3C1.1, however. While the falsified documents produced by the defendants in the cases cited by Samojla directly refuted the charges against the defendants, *e.g., United States v. Coyne*, 4 F.3d 100, 115 (2d Cir. 1993), this is not essential to a finding of willfulness. Here, other facts found by the district court and reasonable inferences from those facts support the district court's finding that Samojla acted with the required intent under U.S.S.G. § 3C1.1.

Samojla next argues that the district court erred in applying the obstruction enhancement because the fake minutes did not actually obstruct the FBI investigation and were therefore not material. We have already rejected this understanding of materiality in the context of U.S.S.G. § 3C1.1. *E.g., United States v. Bedolla-Zavala*, 611 F.3d 392, 396 (7th Cir. 2010) (rejecting argument that the defendant's use of an alias was not "material" because it "'actually had no effect' on the 'case or its outcome'"); *Grigsby*, 692 F.3d at 785 ("A false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed. . . The statement need not *actually* affect the decision." (internal quotation marks and citations omitted)). Given the district court's findings, Samojla's behavior falls squarely under the conduct described in Application Note 4(C) to U.S.S.G. § 3C1.1 and application of the enhancement was appropriate.

**AFFIRMED**.